# EXHIBIT A

(Ref. 01-34-2003)

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE        **Date:** 02/16/2005

**To:** Pocatello ITC      **Attn:** Deborah Gross,
                                     Operations Manager

**From:** Administrative Services
        Personnel Assistance Section
         Occupational Safety and Environmental
           Program (OSEP) Unit, Rm LS 403
           **Contact:** Eric L. Osnes (202) 962-9199
         Health Care Programs Unit (HCPU) Rm 6344
           **Contact:** James E. Yoder, MD (202) 324-1919

**Approved By:** Coggins William B
                   Tucker Edward J
                   Grey Margaret M

**Drafted By:** Yoder James E

**Case ID #:** 67E-HQ-897459 SUB M

**Title:** ROSE WELLARD
         ARCHIVE TECHNICIAN
         EVALUATION OF OCCUPATIONAL EXPOSURE

**Synopsis:** This Electronic Communication (EC) provides response to information provided from captioned employee contained in EC 67E-HQ-897459-M, dated 11/09/04, from the Pocatello Information Technology Center (ITC). The employee's medical condition continues to be evaluated and no further testing of the archive file is indicated at this time.

**Details:** Ms. Wellard (EOD: 05/22/88; DOB: 04/18/59), is assigned to the Pocatello Information Technology Center (ITC). In Electronic Communication 67E-HQ-897459-M, dated 01/04/05, from the Pocatello ITC, Ms. Wellard informed the Occupational Safety and Environmental Program (OSEP) Unit of her desire to obtain test information regarding an archive file (91-5212). This file was thought by Ms. Wellard to be responsible for her continuing health problems since her respiratory exposure upon opening the container in July 2004. She requested that the OSEP Unit authorize testing of the file for infectious disease and chemical sources that might be contributors to her medical problems. Medical information was included for justification.

       Martha I. Buitrago, MD, infectious disease specialist, in a clinical report dated 12/20/04, noted from her medical history taken from Ms. Wellard that she was exposed to "a

To:  Pocatello ITC  From:  Administrative Services
Re:  67E-HQ-897459 SUB M, 02/16/2005

horrible smell" from the named file in July 2004.  Symptoms from exposure included being "sick to her stomach and within 15 minutes her coworker noted that a blood vessel burst in her left eye.  Three days later, she had a bad cough that lasted for about 3 weeks and never was completely gone."  Medical evaluation included resting pulmonary function testing, chest x-ray, blood count, and tests for autoimmune dysfunction (ANA) and inflammatory response (C-reactive protein) were normal.  There was a suspicion of asthma.  Past medical history was unremarkable except for history of eczema.  Ms. Wellard was initially prescribed prednisone for 15 days and azithromycin, an antibiotic.  Ms. Wellard delayed taking the medication for a few weeks, and reported no significant response to treatment when the prednisone was taken.

Dr. Buitrago reported that Ms. Wellard's "main concern today is the fact that she is also having mental changes in that she has total lack of energy."  Ms. Wellard reported to Dr. Buitrago that "people tell her that her sentences make no sense" and that "people think that her mind 'goes in and out'." Review of medical history by Dr. Buitrago indicated a weight loss of 20 pounds, lack of energy, and feeling very hot or very cold, blurry vision, pain in her right shoulder which Ms. Wellard stated "popped at one point when she was coughing."  Ms. Wellard also reported "rashes all over her body" and losing track of thought in the middle of a conversation."  Ms. Wellard felt unable to perform her job due to lack of concentration.

Dr. Buitrago's diagnostic impressions were a change in mental status, questionable petit mal absence seizure disorder, chronic cough, and weight loss.  An MRI was ordered, as well as antibody testing for history of fungal exposure.  Dr. Buitrago asked in follow-up letter, dated 12/27/04, to the OSEP Unit that the archive file be tested "for bacteria, fungus, and mycobacteria, as well as for chemical residue in order to find any clues as to her medical condition at this time."

The OSEP Unit obtained the archive file.  The box which contained the archived file was sent to the U.S. Public Health Service for anlaysis.  Results of testing of multiple sections and the outside yellow manila envelope detected no fungal or bacterial growth, except for 3 colony forming units per square inch ($CFU/in^2$) from the outside of yellow manila folder 91-5212-180.  Chemical residues were not present and, therefore, further analysis was not conducted.

There is no apparent medical explanation which would link the single occupational exposure described to a contaminant

2

To:  Pocatello ITC  From:  Administrative Services
Re:  67E-HQ-897459 SUB M, 02/16/2005

with the Ms. Wellard's medical conditions.  Dr. Buitrago has
scheduled appropriate testing to assist in evaluating
Ms. Wellard's medical condition.  Tubercular skin testing and
fungal antibody testing (ordered by Dr. Buitrago) would be more
helpful to determine history of exposure than any continuing
efforts to grow such organisms from the file in question.  As to
chemical testing, no residues were detected.

        Ms. Wellard has submitted a claim to the Office of
Workers Compensation for her continuing medical problems which
has been thus far denied.  The wide ranging symptoms cannot be
directly attributed at this time to an occupational exposure
cause.  Once a diagnosis is made, there may be grounds to
consider occupational aggravation of an underlying medical
condition.

RECOMMENDATIONS:

        a. No further medical testing of the archive file is
indicated at this time unless it becomes necessary to clarify
specific questions raised by Ms. Wellard's medical evaluation.

        b. Ms. Wellard should be requested to continue to
provide updated medical information to OSEP Unit and/or HCPU to
assist in tracking to a conclusion.

        c. This incident should be utilized by the Pocatello
ITC and OSEP Unit to reinforce established guidance for opening
any suspicious package or moving such a package as soon as known
to a biological safety cabinet so that respiratory exposures
could be better controlled.

To:  Pocatello ITC   From:  Administrative Services
Re:  67E-HQ-897459 SUB M, 02/16/2005


**LEAD(s):**

**Set Lead 1:   (Action)**

POCATELLO ITC

AT POCATELLO, ID

Pocatello ITC is requested to provide updated reports
from captioned employee or offer to the employee that they may be
sent directly to HCPU until an appropriate diagnosis is
established to resolve occupational exposure concerns.

♦♦

# EXHIBIT B

July 13, 2005

Federal Bureau of Investigation
FOIPA Section
935 Pennsylvania Avenue, NW
Washington, D.C. 20535


To Whom It May Concern:

I am an employee of the FBI, Rose A. Wellard; entered on duty 05/22/1988; date of birth 04/18/1959; place of birth Pocatello, Idaho; personnel file #67E-HQ-897459. I am writing to request the following information:

1. All documentation concerning the handling of an occupational exposure which occurred on 07/19/2004, at the Pocatello Information Technology Center, Pocatello, Idaho, concerning archived HQ file 91-5212 and Archive Technician Rose A. Wellard.

2. All records prepared, collected or maintained by the FBI providing complete results and documentation of laboratory testing completed on archived HQ file 91-5212 which was coordinated by the Health Care Programs Unit, Dr. James E. Yoder, MD, Room 6344, per EC dated 02/16/2005, 67E-HQ-897459 SUB M, serial 8 (attached).

3. All records prepared, collected or maintained by the FBI and all policy set forth by the FBI concerning any and all chemicals used by the FBI to process evidence and photographs from the period of time spanning 1940 through 1950, including information maintained by the FBI Laboratory concerning the same.

Examples of records covered by this request include memoranda, correspondence, analyses, evaluations, policies, reports, notes of meetings and other written records or records by any other means, including but not limited to records kept on computer, including e-mails. This specific issue has been addressed in the Records Management Division, Administrative Services Division, Information Technology Operations Division, the Office of General Counsel and possibly others.

**Due to serious medical problems which have occurred following my handling of the above-noted file, I am requesting expedited handling of this request to assist in medical treatment and diagnosis of my condition.**

If you need further information or require payment to process this request, please contact me at one of the following:

Home telephone number:    (208) 238-1250
Work telephone number:    (208) 238-5104
Cell telephone number     (208) 241-1250
Home address:              1298 Ridge
                          Pocatello, ID 83201

Thank you for your time and assistance.

Sincerely,

*Rose A. Wellard*

Rose A. Wellard

State of Idaho

County of Bannock

    On July 13, 2005, Rose A. Wellard personally appeared before me, whom I know personally to be the individual who signed this document.

*Ann Ratliff*

Notary Public

(Seal)

ANN RATLIFF
NOTARY PUBLIC
STATE OF IDAHO

Residing at Pocatello, Idaho

My commission expires February 13, 2010

# EXHIBIT C

August 11, 2005

Federal Bureau of Investigation
Office of the Director
935 Pennsylvania Avenue, NW
Washington, DC 20535

Attn: Director Robert Mueller

Dear Director Mueller:

I am writing to ask for assistance in regard to an incident which happened while performing my
duties with the FBI. I am an Archive Technician with the Pocatello Information Technology Center
(PITC) and have been employed at this location for the past 17 years. As a part of my job I perform
a line-by-line review of old FBI files to determine if they meet the criteria for destruction or if they
should be considered historical and sent to the National Records Center in Maryland. In July 2004
while reviewing a bank robbery file, photographs and evidence from the early 1940s, I noted a very
noxious odor coming from the file unlike anything I have ever smelled before or since. This fact
was noted by other employees who could smell it clear out in the hallway and were trying to locate
the source. I feel that I was exposed to some type of hazardous substance from this experience and I
have been experiencing health problems since that time, beginning with immediate nausea and a
hemorrhage in the right eye followed by a serious cough a couple of days after the initial exposure
and progressing to much more serious medical problems. Prior to that time I was very healthy and
had been working 12 to 14 hours a day on a special project with the Records Management Division
in addition to maintaining my own home and large yard.

The first week of August 2004, the PITC underwent an occupational safety and health inspection.
During this inspection, Kirk Weber, Occupational Safety Officer for the PITC, asked for guidance
regarding this incident. He was advised to contact Industrial Hygienist Eric L. Osnes to notify him
of this incident and to have the file tested through an independent laboratory that contracts with the
FBI. A few days later, Mr. Weber informed me that he had spoken with Mr. Osnes, who felt we
should wait for my cough to go away and then burn the file to properly dispose of it since it would
be nearly impossible for the lab to determine what I had inhaled from the file. He suggested that
Mr. Weber confer with Dr. James Yoder, a medical doctor with the Health Services Program Unit,
to see if he agreed. Mr. Weber indicated that it would be more sensible for me to talk to Dr. Yoder
since I could answer any questions he might have. Dr. Yoder concurred that I had inhaled
something from the file and said that it would take time for my body to heal itself and get rid of
whatever was in my lungs. He also agreed with Mr. Osnes as to the handling of the file, indicating
that we should wait until my cough went away and then burn the file. He indicated that it would be
very difficult to determine what was in the file that caused the problem, that "this isn't television,
like CSI," and that "we don't really solve these problems in an hour." At that time I pretty much
gave up hope of having the file tested.

On August 11, 2004, I was directed by Gerald Whitmore, Unit Chief of the Records Management
Division at FBI Headquarters (FBIHQ), to send the file back to him personally. He said that he had
been in meetings regarding this incident with the hierarchy of the Records Management Division,
namely Marie Allen, Section Chief; a Deputy Assistant Director (I didn't get his name written down
but I assume he is Harold Hendershot); William Hooten, Assistant Director; and someone else about

this file whose name I also did not get written down (a total of five people), and further indicated that the Assistant Director had discussed it "higher up." In these meetings, the possibility of the file being contaminated through an act of terrorism was discussed (a one percent possibility was agreed upon). He said the Assistant Director indicated that the risk of this possibility was too high and the file had to be tested. He said they discussed the fact that the FBI is delving into older and older files and there is a possibility that this kind of incident could happen again on a larger scale. It was further disclosed in these meetings by the Deputy Assistant Director that during the 1940s chemicals were used to process evidence and that there was a possibility that some of the papers in the file may have been contaminated by some type of chemical. It was agreed that the file had to be tested by the FBI Laboratory to determine exactly what had caused the problem, especially since they are aware of the exact types of chemicals used in the 1940s by the Bureau. He said that in these meetings it had been decided that if the FBI laboratory could not determine what had caused the problem, that the file would be sent to the Centers for Disease Control to have them look at it because "we have to know what we're dealing with". He further indicated that the results may well be the catalyst for changing the policies of the Bureau for the handling of very old files. He said there had been a long-standing question about the possibility of molds, mildews and other harmful substances in those old files, but this issue had never been specifically addressed before. The file was boxed up and sent back to his attention per his specific instructions (due to Biohazard precautions) on August 11, 2004.

When I had not heard anything from Mr. Whitmore by early September, I contacted him and he told me that he had attempted to have the file tested at the FBI Laboratory and they had refused to test it since it would be analytical and they only handle criminal cases. No attempt had been made in the interim to find a laboratory who would test it and there were no plans to do so. Since that time I have tried repeatedly to get the file tested through both the Records Management Division and through the Administrative Services Division.

Although I have been told by all my doctors that it would be very beneficial in treating and identifying my medical condition to have the file tested for contaminants, I have been unsuccessful in getting any type of meaningful assistance from FBIHQ. On January 9, 2005, they finally sent the file to a laboratory in Philadelphia to test for basic fungus and bacteria, both of which came back essentially negative. Although the communication from FBIHQ indicated that there were no chemical residues in the file, they have not provided any documentation to support this claim. In response to my requests, they have said that, "The wide ranging symptoms cannot be directly attributed at this time to an occupational exposure cause. Further, once a diagnosis is made there may be grounds to consider occupational aggravation of any underlying medical condition." They have indicated that they will only test the file further as each individual contaminant is requested specifically by a doctor or a medical diagnosis is made to support the request. My doctors say that they could guess forever and still not guess the right contaminant and they could also test me forever trying to identify the problem, but the chances of hitting it right are slim at best. One doctor even told me that I have less than a five percent chance of accidentally stumbling across the source of the problem through medical testing alone and the more time passes the less my chances will be. They have tested me for obvious things (fungal, bacterial and lung infections) and the tests have come back negative. It is my position that comprehensive testing of the file should be completed until we identify what is contained therein. Something has to be causing the extremely noxious smell of the file, a fact which, as I indicated previously, was noted by various other employees during my review of the file and in the weeks after. It may even be a combination of things. I realize that this would not be an easy task, but the FBI has the most advanced laboratory in the country and possibly the

world. It is our file, I am your employee and it could happen again in the future! It should be extremely important to the FBI to identify what has caused this problem. I am asking for you to make an exception regarding analytical testing of the entire file at the FBI Laboratory, including evidence, photographs and the document that appears to be an x-ray of currency which is contained in one of the volumes. If you are unwilling to grant this request, I am asking you to release the file to me in its entirety so that I can have it tested by an independent laboratory of my choice. I feel that there is a very, very small chance that this file is not involved in my medical problem, because I was not having any medical problems before my review of this file and have had them continuously since that time. Since the FBI seems sure that this file did not cause the original problem, a complete testing of this file would either eliminate or establish it as the cause.

In the interim I have requested a complete list of chemicals utilized in the handling/processing of evidence in the 1940s by the FBI for possible clues regarding the medical problems I have experienced since reviewing this file. I have also asked exactly where the file is physically located at this time since I am afraid with file will be destroyed. Although these requests were made to the hierarchy of the Records Management Division, the Administrative Services Division and the Office of the General Counsel in the middle of January and February, they have not even acknowledged my requests, let alone provided me with an answer.

On March 9, 2005, I sent a letter to all the doctors involved in my treatment attaching the results of the laboratory tests and asking them for any suggestions for any contaminants whatsoever that could be causing any part of my medical problems so that we can provide a list to the FBI. In reading copies of their medical notes from the past, I recognized that the doctors notes have not accurately reflected my symptoms in the past and the present. To correct this problem, I prepared a list of my medical symptoms and their progression and enclosed it with each letter as well in an attempt to clarify their understanding of my medical condition. To date I have received one reply back which states that due to the seriousness of the medical condition, he would recommend complete testing of the file, although he does not have the experience or knowledge to be specific about which chemicals or toxins the file should be examined for. The other doctors have basically said the same thing, but not in letter form, and advise that they have exhausted their areas of expertise.

In the middle of all this, I was notified by the Office of Worker's Compensation that my case is going to be denied since I have not proven exactly what was in the file that caused the medical problems. They said the "fact of the injury" is in question. They allowed me to submit a letter to them enclosing medical records they had not received to date, an explanation of the incident and exactly what I wanted from them, along with letters supporting my claim which were written by PITC administrative and supervisory personnel, coworkers and family members who have knowledge of or have been witness to this incident and/or its after affects. I have 19 of these letters, copies of which are available if you would like to see them. I have many other coworkers who have indicated they would also be happy to write letters of support. In the meantime I am being inundated with medical bills. The determination on whether this case will be denied or not is still pending their review of the described letter and attachments which were sent to them on March 9, 2005. On April 4, 2005, I was notified by a new claims adjuster that after reading all the information provided, she believes my claim is true, but advised that the burden of proof still rests on me not the FBI and until I can prove the case she doesn't see how the claim can be accepted. I don't see how I can prove the case when the FBI has all the evidence. I have notified all my doctors to submit their claims against my insurance and I have begun paying the medical bills.

Up until the middle of March 2005, the doctors I have contacted regarding this incident felt that the sensible medical direction to follow would be an infectious disease. They based their assumptions on the circumstances surrounding my review of the file, the progression of medical symptoms and the variety/mutation of medical symptoms since that time. They suspected an inhalation of some sort of contaminant, either bacterial, fungal or chemical. On December 22, 2004, my doctor ordered an MRI on the basis of "change in mental status" looking for seizures as an explanation for the "blank look" people around me kept commenting on. The MRI showed a brain tumor which they assume is a meningioma. When I first visited Dr. Clark Allen, a Neurosurgeon in Pocatello, he told me that he would be reluctant to perform surgery on the tumor since we have this unknown factor involved and there could be some type of contaminant in my blood that could infect the brain or could cause problems with the anesthesia or other unknown factors. He ordered a second MRI in March which showed that the tumor has not grown and he indicated he would recommend having it removed at that time. He also told me he would recommend a second and even a third opinion. In the middle of March I went to the University of Denver for a second opinion and the Chair of the Neurosurgery Department, Dr. Kevin Lillehei, recommended leaving the tumor in and watching it for a while, having another MRI in six months and then another six months, etc., until we decide to have it removed. He said he is 95 percent certain that the brain tumor is a slow-growing meningioma, but there is a five percent chance that it is something entirely different and he feels we should have a complete work up done on it when we have it removed to see if there is any correlation to the file. But first we have to know what is in the file! In the meantime, he reviewed the attached list of symptoms and indicated that, although they appear very random and disconnected, they are actually symptoms of Multiple Sclerosis (MS), which attacks the Central Nervous System. Neither of my two MRIs show evidence of MS so he feels that it is something that is mimicking MS. He feels that based on this fact we should be testing the file for chemicals or toxins that attack the Central Nervous System. The Vice Chair of the Department of Radiation Oncology, Dr. Brian Kavanagh, felt I should have the tumor removed and also suggested that we have a complete work up done on it at the time of removal. Although he feels that there is a high probability it is a meningioma as well, he wants to be sure what we're dealing with because of the suspicious events surrounding the file. He also saw the connection to MS when he looked at the list of symptoms. Both advised me to get a spinal tap when I returned home and have a complete work up performed in the hopes of finding some trace of chemical or toxin that could give us clues to the cause and treatment of my condition. They also told me that, because of the location of the tumor, the only symptom that it could be causing is headaches. They are also unable to determine if the tumor is a secondary condition or whether it is all part of the same problem at this point.

When I came home and located information on what chemicals cause damage to the Central Nervous System, it said that damage of this type is reversible if it is identified and treated in a timely manner, otherwise it becomes irreversible. It didn't indicate what "a timely manner" is or specify which chemicals cause such damage. I'm scared that my window of opportunity is slipping away and I don't know what to do or where to turn to solve this mystery in time.

On April 6, 2005, I had a spinal tap taken to run a series of tests which were ordered by all of the doctors involved in my treatment, for a total of 13 tests which tested for bacterial to fungus to MS. On May 2, 2005, I was informed that those tests came back negative. In the meantime, my health continues to deteriorate. My doctor is currently attempting to locate a toxicologist who will agree to consult on this case.

The very saddest part of this whole situation is that I have lost my trust in the FBI.  It took a great leap of faith to send the file back to FBIHQ in the first place, even though I acknowledge that it belongs there.  I was afraid then and I'm more afraid now that the file will be destroyed,  misplaced or altered and I will never know what caused this damage to my health or restore it to an acceptable level.

I am requesting that the file be fully tested by the FBI Laboratory and I am also asking for copies of the original findings on all testing.  In the event you decide not to have the file tested by the Lab I am asking that you release the file to me in its entirety so that I can have it tested through an independent laboratory.  I would like to reiterate that this type of thing could happen again to other employees in the Bureau since employees across the country are working with older and older files in the performance of our job and we have not identified what caused the smell in the file.  **I am asking for this issue to be handled under the Whistleblowers Protection Act.**

I am asking for your assistance because I feel like I am caught in a hopeless circle.  The doctors say they need the file tested so they'll know what tests to conduct on me to determine the cause of my medical problems; the FBI wants the doctors to tell them exactly what they need the file tested for before they will perform further testing; the Office of Workmen's Compensation doesn't want to approve this claim until I prove exactly what I inhaled or was exposed to that caused the problems, which would also require complete testing of the file; and I don't have the money or the stamina to just keep seeking medical treatment without any real direction.  I know that the burden of proof in this situation rests on me.  I also know that FBIHQ has all the evidence in their hands and I feel that they are refusing to provide reasonable assistance in a case involving such a serious medical deterioration.  If this file was evidence in a domestic terrorism case or if you or someone else of any significance had inhaled or been exposed to something from the file and had these medical problems, the FBI would have done everything in their power to determine the cause and find a solution.  I have been a loyal employee for 17 years.  I love my job and I am very proud of the work I have done over the years.  I think I deserve equal consideration.

My deepest hope over the last year was that the FBI would do the honorable thing in conducting the type of exhaustive investigation and laboratory testing we are famous for.  On August 10, 2005, I sent similar letters to Idaho's Congressional delegation, but I would rather believe this issue could be resolved without outside pressure.  You are my last chance for that to happen.

I have attached a list/time line of my medical symptoms.  I also have much more documentation too voluminous to include with this letter which I would be happy to provide in support of this letter.  Thank you in advance for any help you might be able to give me.

Sincerely,

Rose Wellard
1298 Ridge
Pocatello, Idaho 83201

(208) 238-5104 (work)
(208) 238-1250 (home)
(208) 241-1250 (cell)



**July 19, 2004**
Reviewed volumes 1-3 of file
Which took approximately 3 hours.
Experienced immediate
hemorrhage of left eye and nausea
At this time notice foul odor from files.

**July 20, 2004**
Completed review of volumes 5-8
Of file, along with large envelope
Of black and white photographs which
Took approx. 5hours. Placed file in plastic
garbage bag then inside original box.

**July 22, 2004**
Developed severe
cough

**July 26, 2004**
Took file from original box, placed
it in it's own box, sealed
it and placed it under my desk
for safekeeping.

**July 27, 2004**
Notified by my supervisor
That he had notified FBIHQ
Of this incident sometime
Previously.

**August 01, 2004**
Filled out Workman's Comp
paperwork

**August 02, 2004**
On advice of Office Services
Supervisor, sealed file in
Ziplock bags and placed
Bio Hazard labels on
outside of box

**August 03, 2004**
Office Services Supervisor
and Office Safety Officer
Placed box containing
file in airtight vault.

**August 04, 2004**
Began seeking
medical treatment

**August 11, 2004**
Unit Chief at FBIHQ gave
me his word file would
Be safeguarded by him
And hand delivered to
The FBI Laboratory
For complete testing

**August 11, 2004**
File was packaged according to
directions provided by Unit Chief to
safeguard possible Bio Hazard
file for return to FBIHQ

**July 2004**

**2004**
July – December
Developed
Severe Cough

**2004**
July – present
Loss of energy,
no stamina

**2004**
July – September
Weight Loss

**2004**
July – Present
Blurry
Vision

**2004**
July – Present
Change in mental status
(memory, problem solving
abilities, multi tasking abilities,
cohesive thought process,
focus, organizational skills )

**August 2004**

**2004**
August – present
Eczema-*Like* rash
that comes and
goes

**August 2004 –
May 2005**
Numerous
cankers, cold
sores

**August 2004 –
March 2005**
Joint aches

**2004**
August – Present
Change in bowel
habits

**2004**
August – Present
Occasional
difficulty
swallowing

**September 2004**

**2004**
September -October
Hormonal
imbalance

**2004**
September -Present
Patterns of
bruising

**October 2004**

**November 2004**

**2004**
November -Present
Persistent
headaches

**2004**
September -Present
Intermittent sore
throats/earaches that
come suddenly and
disappear suddenly a few
hours later

**December 2004**

**January 2005**

**2005**
January -Present
Numbness/tingling
in lower
extremities and right
side of head and face

**2005**
January -Present
Heart racing

**2005**
January -Present
Occasional dizziness
causing nausea

*Rose A. Wellard*                                                                          *August 10, 2005*

<u>MEDICAL SYMPTOMS</u>

Cough: From July and into August 2004 I had a severe cough and lost my breath when I talked.  I could not stop coughing and I woke up numerous times in the night coughing.  Toward the middle of August the cough became less severe and I could talk some without coughing, although if I talked very much I began coughing again.  It still woke me up in the night.  In December the cough seemed to get a little better.  I could talk for a length of time without coughing for the most part.  This was never a productive cough.  It lessened and lessened until it very seldom happens now.

Loss of energy: Throughout this period I have had no energy and get physically tired easily.  I have no stamina and I'm tired all the time.  Even when I have days I feel a little better and I get out and try to do things I can only make it about two hours and I'm exhausted.  Types of activity include grocery shopping, paying bills, weeding in my yard, etc.  I have about the same span of good work time at work.  After that it's hit and miss and I'm not sure I'm completing my work accurately.

Weight loss: I lost 15 pounds in July 2004 and an additional five pounds in August 2004.  I still have no appetite.  I get hungry, but after two or three bites I could easily be done eating.  Once my husband came home from Alaska the end of September 2004, he started making meals and I stopped losing weight because I was eating even though I wasn't hungry.  As soon as he went back I started losing weight again, slowly this time.

Blurry vision: I have had a continuing problem with blurry eyes and when tested in March 2005 the sight in my right eye has changed from 20/25, where it has been for the last six years, to 20/30.  The left eye has stayed at 20/25.

Mental status: In September 2004 people started telling me that I really scared them with my behavior, the way I looked and my mental status.  I felt scared myself, like I could not process a complete thought.  Since this all started I have had periods of time where I experience confusion and/or lack of focus where I have to really concentrate to complete a task correctly or I'm confused about information and tasks of which I have a thorough knowledge.  One coworker told me the unit is reluctant to ask me questions about information they know that I know (like records retention, software and computers) because when they have asked me questions I have given them a look that is completely blank.  My friends and family say the same thing.  Sometimes when I am working on something and concentrating hard, I feel like thoughts go through my head so fast I can't grasp ahold of them.  When I try to figure out what they were I can't, even though I know they were important to what I was doing at the time.  I

Rose A. Wellard                                                                                            *August 10, 2005*

forget things easily and I have a hard time switching from one task or subject to another.  When I'm talking on the telephone, if something takes my attention away for a second, I'm lost in the conversation.  That happens a lot with in person conversations too.  Thoughts sometimes come to me in pieces instead of in a cohesive process.  In May 2005 I started to notice that when I read things I switch them around sometimes, like when a blank asks for a date of birth and another one asks for an SSAN, I switch the information around.  Also, I'll see a number and think a number, like a 6, but write down a 5.  And sometimes I'll be thinking one word and type an entirely different word.

I also have piles of stuff on my desk at work and on my table/counter at home of stuff that needs to be worked on.  If I put things away, I can't remember that I need to take care of them, so they have to stay out until they are completed.  I have lost all sense of organization, which is very frustrating to me.  Sometimes in the middle of reviewing files I can't remember which type of work I am supposed to be reviewing the files for or the name of the subject I'm looking for.

Rashes:                    I have had eczema for a number of years and I usually have outbreaks two to three times a year.  They typically last about one week and are on both wrists and the heel of my right hand.  Beginning in the middle of August, I got an outbreak of a rash that started like eczema and lasted for over a month, with an outbreak on both elbows, the tops and sides of both feet, the backs of both hands, the fingers, both wrists and the heel of my right hand.  Even though I used the same methods to relieve the condition that I always have, I could not get it under control.  It finally subsided on Friday, 09/24/2004.  On Wednesday, 09/29/2004, the heel of my right hand broke out in blisters and began itching again for one week.  From October 13th through November 3rd, I had a rash that covered both arms and hands to the elbow again, and on Sunday, 11/07/2004, the rash came back again.  It has come on and off since that time, sometimes lasting for only a day or two and sometimes much longer.  The rash was back on 03/11/2005 and lasted until the first week of April and again on 07/06/2005.

Hormonal imbalance: I had breast tenderness and hot flashes in September and October 2004 which lasted about six weeks and has occurred occasionally since then, even though I had a complete hysterectomy six years ago and have not changed anything with the hormones I have been taking since that time.

Bruising:                  Sometime in September and into October 2004, I had a half circle pattern of bruises, the largest about the size of a small pencil eraser and then getting smaller from there.  These were on my left hip.  A couple of weeks later I had the same pattern on my left breast.  These looked almost like

Rose A. Wellard                                                                *August 10, 2005*

blood blisters.  In January 2005 I had the same type of bruising, with smaller spots, in a double line under my right arm.  In July 2005 I noticed two of them on the inner thigh of my left leg.

Headaches:          Sometime around Thanksgiving 2004, I started developing frequent headaches that I usually can't relieve with pain medication.  Anytime I think hard about something that I can't remember or really concentrate on a task, I develop a headache.

Sore Throat:        On Sunday, 11/14/2004, I suddenly got a very sore throat and earache, which went away just as suddenly a few hours later.  This happened again on 02/23/2005.  I have had a sore throat on and off throughout this period of time which has not come and gone as quickly as these two incidents.

Cancer sores:       I have had numerous canker sores and cold sores throughout this period of time.  By June 2005 these had lessened.

Body temp:          I get cold easily and can't seem to get warm even when the room is 75 degrees.

Joint aches:        Sometimes my joints ache, mostly in my shoulders and my hips (the hips only hurt when I'm laying down).  The left shoulder feels like nerve pain most of the time.  These went away by the first part of 2005.

Bowel Habits:       I have had changes in my bowel habits.

Swallowing:         Occasionally when I try to swallow, it seems like I can't remember how.  After a second or two of panic, I finally do swallow, but I can't remember what I do to accomplish that.

Numbness:           In the middle of January 2005 my right leg and up into my groin started falling asleep from my foot up during the night.  On 02/07/2005, my leg and groin went numb and stayed that way.  On 02/12/2005, the right side of my head was numb when I woke up in the morning.  This did not affect my eyes or facial muscles.  On 02/13/2005, my right eye was blurry and dry most of the day and on 02/14/2005, I woke to a dream about excruciating pain and found the right side of my head numb again.  It has been numb since that time, always on the top and side of the head, and on and off on the right side of my face from my forehead to my chin.  Beginning 05/11/2005, it has stayed numb through my face from my forehead to the chin.

Heart racing:       Starting in mid January I noticed my heart racing on and off hard enough it makes me catch my breath.

Rose A. Wellard                                                                                    *August 10, 2005*

| | |
|---|---|
| Abdominal pain: | Beginning in March 2005 I began to get a sharp pain my lower right abdomen which comes and goes. This was gone by May 2005. |
| Muscle spasms: | On 03/25/2005, I began to feel like I was going to get a muscle spasm on my lower right calf on the outside edge. I very rarely ever get muscle spasms and I have never had one before on the outer leg. These lasted throughout the entire day. |
| Vertigo: | In January I began having occasional dizziness to the point of nausea. On the evening of 03/28/2005, I started experiencing vertigo where the room was spinning and I had no balance at all. I couldn't get out of bed without help. One week later, everything still seemed out of balance to me, but the room only spun when I looked up or down or when I laid down or got up. When someone/something moved past me quickly (including the wind) or if I moved my head too fast I got dizzy. This lasted until 04/29/2005. On 06/19/2005 the vertigo came back. For the most part it is the same as it was in April, but now I occasionally get very dizzy when I'm just sitting still and I feel like I'm going to fall over. This went away again on 07/21/2005. |
| Balance: | After I stopped experiencing vertigo on 04/29/2005, I was still left with a balance problem. I always walk next to a wall, take the arm of a coworker or family member, or use a walking stick. On Monday, 05/23/2005, my friends pointed out to me that I am walking on my tiptoes on my left foot. My balance has been particularly bad this week and people feel it's because of the tiptoe. I have to concentrate really hard on walking to walk flat footed with both feet. I feel like that makes my balance even worse. On Tuesday, 05/24/2005, as I was walking I felt like there was a small earthquake or maybe like an elevator dropping out from under me. This happened twice and I was walking on solid floors when it happened. On Thursday, 06/02/2005, I was told by a physical therapist that I have very poor balance in my feet and no coordination either. At that time he told me that I need to start wearing a gait belt so people can safely help me walk and also forearm crutches.. He also said I have slow coordination in my hands, which could explain the typing problems I'm having. I began using the forearm crutches on 06/06/2005. I can no longer drive and I have to rely on friends and family to take me everywhere I need to go. |
| Language problems: | In May I began to notice that occasionally I stutter and when I am speaking and I'm tired I switch words around (tap lop instead of lap top) or words become jumbled and I can't get them to come out right or they're incomplete or slurred. When I spell words and I'm thinking in a sentence, many times I start with one word and in the middle switch to the second word, which leaves me with a word that makes no sense. I also have a |

*Rose A. Wellard*                                                              *August 10, 2005*

problem with looking at one number, but writing down a different number or sometimes transposing numbers, so I have to look at all my typing, spelling and writing two or three times to make sure it's accurate.

Nausea:                        Starting 05/30/2005 I began getting very sick to my stomach every morning.  For the most part it is gone by afternoon, or at least lessened. This lasted for about six weeks and then went away.

# EXHIBIT D



**U.S. Department of Justice**

Federal Bureau of Investigation

Washington, D. C. 20535-0001

September 22, 2005

Ms. Rose Wellard
Federal Bureau of Investigation
Pocatello, ID 83201

Dear Ms. Wellard:

This is to acknowledge receipt of your correspondence, dated August 11, 2005, to Robert Mueller, Director, Federal Bureau of Investigation (FBI). Your correspondence was referred to me for response

I am writing to reassure you that the Federal Bureau of Investigation has a continuing desire to satisfy your health concerns.  It is my understanding that your personal physician Martha I. Buitrago, MD, infectious disease specialist, has performed a medical evaluation which included testing of lung function, chest x-ray, blood count, and tests of immune function and inflammation which were all unremarkable.  Additionally, you were prescribed an antibiotic and steroids to treat your medical condition.

You have reported mental changes manifested by difficulty in normal conversation, and lack of energy.  In a clinical report dated December 20, 2004, Dr. Buitrago noted a weight loss of 20 pounds, lack of energy, feeling very hot or very cold, blurry vision, and pain in your right shoulder which you stated "popped at one point" when coughing.  You have reported body rashes and have felt unable to continue your duties from lack of concentration.

Dr. Buitrago, in a letter dated December 27, 2004, requested that the archives file be tested "for bacteria, fungus, and mycobacteria, as well as for chemical residue in order to find any clues as to her medical condition at this time."  The FBI's Occupational Safety and Environmental Program Unit arranged for the file to be tested through their relationship with the U.S. Public Health Service.  Results of testing of multiple sections and the outside yellow envelope detected no fungal or bacterial growth, except for three colony forming units per square inch from the outside of yellow manila folder 91-5212-180. The bacterial growth finding is consistent with natural background contamination.

Ms. Rose Wellard

  Chemical residues were not part of the testing protocol since the U.S. Public Health Service suggested that information derived from the analytical method would not be indicative of the volatile components, but would be indicative of the chemical composition of the paper.  It was our intent that you should have received copies of initial test reports performed on the archive file that you were evaluating when your health concerns started. A copy is enclosed to ensure your receipt.

  Since initial testing did not substantiate significant microbial or bacterial growth coupled with the fact that the file in question is indistinguishable from other files, it is difficult to form a medically plausible hypothesis which would explain the file as the cause for your continuing medical problems.  The Office of Workers' Compensation Program (OWCP), has reportedly been likewise unable to agree on a likely work place causal connection.  OWCP remains the appropriate office to resolve the work-relatedness of your condition.

  You have not to date been satisfied with findings of initial testing performed on the file.  You have expressed a desire that further testing be done and have offered to perform this testing at your own expense.  Any additional testing deemed medically relevant by your treating physicians will be performed at FBI expense.  A letter from your physician specifying the type of testing required to assess your medical condition should be addressed to me.  Permission to release the file directly is denied since the FBI has a continuing interest in the custody of the file and to validate the accuracy of any test findings.

       Sincerely yours,

       Mary B. Hannagan
       Acting Assistant Director -
        Human Resources Officer
       Administrative Services Division

enclosure

2

# USPHS DFOH ENVIRONMENTAL MICROBIOLOGY LABORATORY
## PHILADELPHIA, PA   LABORATORY REPORT #FBI-05-2R

Client agency: Federal Bureau of Investigation, Washington, DC
POIS#/task #: DSH05 /
Sampling date: 1/6/05
Dates of inoculation: 1/7/05
General location: FBI, Archived Documents
Sampling techniques: Wipe sampling
Medium used: R2A for bacteria
Samples submitted by: G. Bearer
Date characterization completed: 1/11/05

## Wipe samples on R2A plates

| Sample ID | Sampling Location | Area (in$^2$) | Dilution factor | Bacteria on R2A @ 25°C |
|-----------|-------------------|---------------|-----------------|------------------------|
| 010605GEB-01 | Center serials 127 | 4 | 10X | No bacterial growth CFU/in$^2$ < 3 |
| 010605GEB-02 | Front page serials 128-140 | 4 | 10X | No bacterial growth CFU/in$^2$ < 3 |
| 010605GEB-03 | Center serials 31 | 4 | 10X | No bacterial growth CFU/in$^2$ < 3 |
| 010605GEB-04 | Outside of yellow manila folder 91-5212-180 | 4 | 10X | Bacteria (1*) CFU/in$^2$ = 3 |
| 010605GEB-05 | Blank | NA$^#$ | 10X | No bacterial growth |

\*   Colony counts.
#   Not applicable.


Characterization completed by: _____

                          Ling-Ling Hung, Ph.D. Microbiologist


Quality control checked by: _____ (Initials)

## WELLARD, ROSE A. (WE) (FBI)

**From:** ████████████████████████
**Sent:** Tuesday, October 11, 2005 2:22 PM
**To:** ██████████████████
**Subject:** Report of AD of ASD



The newly appointed AD of ASD, Donald Everett Packham has reported.  He can be reached at 202-324-3514, in room 10903.  Please address all communications accordingly.

████████████████

# EXHIBIT E

FILE COPY

LAW OFFICES OF

# RACINE OLSON NYE BUDGE & BAILEY CHARTERED

LOUIS F. RACINE (1917-2005)
WILLIAM D. OLSON
W. MARCUS W. NYE
RANDALL C. BUDGE
JOHN A. BAILEY, JR.
JOHN R. GOODELL*
JOHN B. INGELSTROM
DANIEL C. GREEN**
BRENT O. ROCHE
KIRK B. HADLEY
FRED J. LEWIS
MITCHELL W. BROWN
ERIC L. OLSEN
CONRAD J. AIKEN
RICHARD A. HEARN, M.D.†
DAVID E. ALEXANDER††
LANE V. ERICKSON**
LISA M. CHRISTON†††
PATRICK N. GEORGE
SCOTT J. SMITH
LISA A. WOOD, CPA
STEPHEN J. MUHONEN
BRENT L. WHITING
LISA R. TANNER‡
JUSTIN R. ELLIS
JOSHUA D. JOHNSON†††
JONATHON S. BYINGTON

201 EAST CENTER STREET
POST OFFICE BOX 1391
POCATELLO, IDAHO 83204-1391

TELEPHONE (208) 232-6101
FACSIMILE (208) 232-6109

www.racinelaw.net

SENDER'S E-MAIL ADDRESS: dea@racinelaw.net

**BOISE OFFICE**

101 SOUTH CAPITOL
BOULEVARD, SUITE 208
BOISE, IDAHO 83702
TELEPHONE: (208) 395-0011
FACSIMILE: (208) 433-0167

**IDAHO FALLS OFFICE**

477 SHOUP AVENUE
SUITE 203A
IDAHO FALLS, ID 83402
TELEPHONE: (208) 528-6101
FACSIMILE: (208) 528-6109

*ALSO MEMBER WY & IL BARS
**ALSO MEMBER UT BAR
†ALSO MEMBER D. C. BAR
††ALSO MEMBER MO BAR
†††ALSO MEMBER IL BAR
‡ALSO MEMBER CA BAR

November 23, 2005

Donald E. Packham
Assistant Director
Administrative Services Division
Federal Bureau of Investigation
Washington, DC 20535-0001

Re:     Case ID#: 67E-HQ-897459SUBM
        Rose Wellard, Archive Technician
        Evaluation of Occupational Exposure
        Reference Letter of September 22, 2005 from Mary B. Hannagan to Rose Wellard

Dear Mr. Packham:

As your records should reflect, this office represents Rose Wellard, an archive technician at the Pocatello office of the FBI, who became extremely ill immediately following exposure to a 60 year old file on July 19, 2004. When she opened the file on that date, she was immediately assaulted by an extremely strong odor which was noticed by other workers in the building, and she became ill. She has since suffered numerous neurological and respiratory problems, and recently underwent surgery.

The file in question was tested for bacterial infection in January, 2005. Nothing significant was noted, nor could the laboratory identify any chemical residues. In her letter of September 22, 2005, acting Assistant Director Mary B. Hannagan stated "any additional testing deemed medically relevant by your treating physicians will be performed at FBI expense."

Ms. Wellard's doctors have now identified a first set of chemicals which they suspect may be responsible for Ms. Wellard's condition. They would like the file tested for the presence of these

November 23, 2005
Page 2

---

chemicals, or residues of these chemicals, including residues of compounds which these chemicals may break down into, or any other relevant tests which would indicate the presence at some time of phenol compounds and particularly hydroquinone. A letter from Dr. Brandon West requesting these tests is attached.  I am not a chemist or a physician, and I do not intend the use of any language in this letter to limit the testing that may be performed on the file in any way.  By this letter, I am requesting that all tests which may be helpful in confirming or ruling out the presence at any time of the chemical compounds of the type identified by Dr. West be performed as soon as possible.

Following the completion of such tests by such laboratories as the FBI may designate, we request to be provided copies of all documentation relating to the testing of the file, including correspondence with the laboratory, notes generated by laboratory personnel, raw test results, and final conclusions, as well as any other documents generated in response to this request.  Please be aware that it is absolutely necessary that Ms. Wellard and her physicians have complete confidence that the testing is thorough and competent, and that they are receiving the complete results. Anything less could have a seriously deleterious effect on Ms. Wellard's medical treatment.

Following the results of those tests, I expect that Dr. West and the toxicologists which whom he is consulting he is consulting will have additional chemicals to be tested for.

Thank you for your attention to this matter.  Please feel free to call me at any time if I can provide any additional information.  Also, I would appreciate a notification by letter or email that the file has been sent to a laboratory for further examination.  I look forward to hearing from you.

Very truly yours,

DAVID E. ALEXANDER

DEA:ss
Enclosure
c:      Rose Wellard
        Dr. Brandon West, D.O.



# WEST
*Family Medicine*

**Brandon A. West D.O.**
*Board Certified in Family Medicine*



OCTOBER 24th, 2005

**RE: ROSE A. WELLARD**

To Whom It May Concern:

I am writing on behalf of Rose A. Wellard, who on July 19th, 2004, had her first exposure to a 60-year-old file at the FBI office here in Pocatello, Idaho. Since that time Rose has had a gradual onset of neurologic symptoms. There is significant concern that these symptoms could be caused by a chemical exposure during the time of reviewing the file. There was a very strong odor to the file and approximately three hours after working with the file Rose became very sick. It was noticed she had a broken blood vessel in her right eye and then a severe cough developed approximately three days later.

It is my understanding that up to this point there have been no significant findings with the testing done so far. I would ask that the file be tested for Phenol compounds and particularly Hydroquinone. We appreciate your help in this matter. If you have any questions please feel free to call my office.

Sincerely,

BRANDON WEST, D.O.
BW/MTS/nc

1598 Delphic Way, Suite C2, P.O. Box 4868, Pocatello, ID 83205
**Phone (208) 232-1000 • Fax (208) 232-1006**



**Brandon A. West D.O.**
*Board Certified in Family Medicine*

OCTOBER 24th, 2005


RE: ROSE A. WELLARD


To Whom It May Concern:

I am writing on behalf of Rose A. Wellard, who on July 19th, 2004, had her first exposure to a 60-year-old file at the FBI office here in Pocatello, Idaho. Since that time Rose has had a gradual onset of neurologic symptoms. There is significant concern that these symptoms could be caused by a chemical exposure during the time of reviewing the file. There was a very strong odor to the file and approximately three hours after working with the file Rose became very sick. It was noticed she had a broken blood vessel in her right eye and then a severe cough developed approximately three days later.

It is my understanding that up to this point there have been no significant findings with the testing done so far. I would ask that the file be tested for Phenol compounds and particularly Hydroquinone. We appreciate your help in this matter. If you have any questions please feel free to call my office.

Sincerely,


BRANDON WEST, D.O.
BW/MTS/nc


1598 Delphic Way, Suite C2, P.O. Box 4868, Pocatello, ID 83205
**Phone (208) 232-1000 • Fax (208) 232-1006**

# EXHIBIT F

Rose Wellard                                                           February 24, 2006
1298 Ridge
Pocatello, Idaho 83201

Dear Ms. Wellard,

   Dr. Spencer has asked me to address issues regarding the possible chemical exposure
and subsequent illness you have experienced as a result of your employment as an
Archive Technician for the Federal Bureau of Investigation. This exposure in question
involved the review of a sixty-year-old criminal file that emitted a very noxious chemical
odor. I, along with Dr. Spencer and other knowledgeable CROET personnel have
reviewed the information you sent in regard to this case and have narrowed our list of
suspected contaminants to compounds associated with the degradation of photographic
materials as well as to organic or inorganic chemical residues from pesticide applications
that may have occurred while the records were in storage. Please keep in mind that our
opinions are speculative in light of the limited information available and current lack of
objective analytical data we have to work with.

   First, with regard to the deteriorating photographic materials, I spoke with Mr. David
Waters at the Eastman Museum of Photography in Rochester, NY. He informed me that
old photographic negatives were either acetate or nitrate based. Acetate-based negatives
will emit an acetic acid (vinegar) smell upon degradation, whereas nitrate films produce
an 'old socks' smell. He suggested that if these photos were not properly processed they
could contain residual processing chemicals that might impart a yellow or amber color to
the negatives. We feel that none of the standard photo-processing chemicals (e.g. hypo)
are likely to be present in significant residual concentration, nor would they be likely to
produce the symptoms you describe.

   Another possibility is that these photo materials could have been treated with a
selenium-containing toner solution that in the past was used for archival processing
(sulphide toning is used today). Mr. Waters felt that this was unlikely since this type of
toner is used more in art photography, but further research on my part suggests that
selenium toner was also employed to enhance contrast in underdeveloped images.
Selenium toner solutions will emit sulfur dioxide gas or, if treated with acid, hydrogen
selenide gas. Selenium has been described as smelling like rotten horseradish, and people
exposed to selenium often present with a garlic odor to the breath. If selenium processing
occurred, selenium would be present in dusts from the deteriorating photo materials or as
hydrogen selenide gas. The toxicological profile for selenium would be consistent with
the symptomology you describe.

   As regards pesticide residues, we feel these are a possible contaminant based on
information that termite infestation was a problem at the archive center. A variety of
volatile fumigants could have been employed, including phosgene gas, sulfuryl fluoride
(Vikane) or methyl bromide. Methyl bromide was more commonly used in the past, and
its lower volatility makes it suspect, since it would be more likely to be present in
residual form within sealed compartments, including boxed files. The fumigant classes of

compounds are more likely to produce the symptoms you describe than other pesticides such as the now restricted chlorinated insecticides (DDT, chlordane, lindane, etc). An important question is why this one file would be contaminated among all the thousands of files present. We don't have a solid answer other than the chemical may not have been uniformly applied or, once applied, the file in question may have been in a location that was poorly ventilated, allowing for the retention of residues.

As to some of the questions you have asked:

*Is it possible that two chemicals could have interacted with one another to cause such an unusual reaction in this specific file compared to thousands of other files that have been reviewed in the past?*

This is possible, but speculating on all potential interactions that might have occurred, with the information we have, is difficult. One plausible chemical interaction might be the one I described above involving the acid hydrolysis of a selenium-based toner to produce hydrogen selenide.

☐*Is it feasible to test this file for a complete breakdown of the chemicals contained*
*therein?*

Obtaining a complete chemical profile would be expensive and probably unrewarding. It is better to have a targeted list of plausible compounds to test for. We hope we are providing that.

*Is it possible to test the file for volatile chemicals as compared to the chemical makeup of the paper in the file and what is the definition of volatile chemicals?*

It is possible to test the air (head space) surrounding the files for the presence of volatile chemicals. If the files were sealed in an impervious container, such as plastic bags, then an air sample from within can be analyzed. If you could smell it, then you should be able to detect and identify the chemical with the proper instrumentation. Volatile chemicals are those that tend to vaporize at standard atmospheric pressure.

*Identification of the specific type of testing and specific process that would be required to determine the chemical components of the file?*

This question can be better answered by the consulting analytical lab.

*Assistance in locating a reputable laboratory or medical facility with the capability to complete such testing.*

One lab that has been suggested to us is Columbia Analytical Labs at 360-577-7222.

*Is it possible after 18 months for the file to contain the same chemical or chemical reaction from when I originally reviewed the file, or would the chemical mutate or dissipate over time and/or when exposed to air or other conditions?*

Any of the above is possible, depending on the particular chemical compound present. Under proper storage conditions, it is likely that a chemical that may have produced your illness would still be present.

*Are the symptoms that I have been experiencing symptoms of chemical exposure?*

What you have experienced is consistent with chemical exposure. Our speculation about what types of chemicals may have produced your illness are based on the symptoms you describe.

*Could a hair sample be tested for the presence of the offending agent?*

In some cases, chemical agents such as heavy metals, certain drugs, etc., can be detected in the hair of exposed individuals. The agent is deposited within the hair matrix as the hair is being formed, but only during the time of exposure. Thus, you would have to have access to hair that was being formed at the time you were exposed (pubic hair is probably the longest-lived hair on the body). While hair analysis sounds simple, it is actually a complicated procedure that can be confounded by a variety of factors, including external contamination of the sample (shampoos, hair dyes, air pollution, etc), sample collection and preparation procedures, and a variety of technical difficulties that can result in false positive or false negative results. While you could attempt to find the offending agent via hair analysis, be aware that you could also be left with more questions about the results than definitive answers.

One final question you wanted us to address was presented to me through Dr. Spencer. This is in regard to a duplicate file that may exist and whether this file should be tested for the presence of harmful chemical compounds. Yes, this file could be useful, especially as regards the release of age-dependent chemical breakdown products or the presence of selenium or other elements used in photo processing. If the file was stored adjacent to the one you handled, then one could address the question of pesticide residues.

I hope this information is informative and helpful. Please feel free to contact me if you have any further questions.

Sincerely,

Fred Berman, DVM, PhD
Director, Toxicology Information Center
The Center for Research on Occupational and Environmental Toxicology
Oregon Health and Science University

3181 SW Sam Jackson Park Rd., L606
Portland, OR 97239-3098
Ph: 1-800-457-8627          Email: bermanf@ohsu.edu

# EXHIBIT G

**FILE COPY**

LAW OFFICES OF

# RACINE OLSON NYE BUDGE & BAILEY
## CHARTERED

201 EAST CENTER STREET
POST OFFICE BOX 1391
POCATELLO, IDAHO 83204-1391

TELEPHONE (208) 232-6101
FACSIMILE (208) 232-6109

www.racinelaw.net

SENDER'S E-MAIL ADDRESS: dea@racinelaw.net

LOUIS F. RACINE (1917-2005)
WILLIAM D. OLSON
W. MARCUS W. NYE
RANDALL C. BUDGE
JOHN A. BAILEY, JR.
JOHN R. GOODELL*
JOHN B. INGELSTROM
DANIEL C. GREEN**
BRENT O. ROCHE
KIRK B. HADLEY
FRED J. LEWIS
MITCHELL W. BROWN
ERIC L. OLSEN
CONRAD J. AIKEN
RICHARD A. HEARN, M.D.†
DAVID E. ALEXANDER††
LANE V. ERICKSON**
LISA M. CHRISTON†††
PATRICK N. GEORGE
SCOTT J. SMITH
LISA A. WOOD, CPA
STEPHEN J. MUHONEN
BRENT L. WHITING
LISA R. TANNER‡
JUSTIN R. ELLIS
JOSHUA D. JOHNSON†††
JONATHON S. BYINGTON

BOISE OFFICE

101 SOUTH CAPITOL
BOULEVARD, SUITE 208
BOISE, IDAHO 83702
TELEPHONE: (208) 395-0011
FACSIMILE: (208) 433-0167

IDAHO FALLS OFFICE

477 SHOUP AVENUE
SUITE 203A
IDAHO FALLS, ID 83402
TELEPHONE: (208) 528-6101
FACSIMILE: (208) 528-6109

*ALSO MEMBER WY & IL BARS
**ALSO MEMBER UT BAR
†ALSO MEMBER D. C. BAR
††ALSO MEMBER MO BAR
†††ALSO MEMBER IL BAR
‡ALSO MEMBER CA BAR

March 3, 2006

Donald E. Packham
Assistant Director
Administrative Services Division
Federal Bureau of Investigation
Washington, DC 20535-0001

RE:   Case ID#: 67E-HQ-897459SUBM
      Rose Wellard, Archive Technician
      Evaluation of Occupational Exposure
      Reference Letter of September 22, 2005 from Mary B. Hannagan to Rose Wellard

Dear Mr. Packham:

   This letter is to follow-up my letter to you of November 23, 2005.  This letter seeks information on the status of my earlier request for testing of the file that we suspect caused my client's illness, and also to provide you with some additional information relevant to the testing that is needed.

   I have enclosed a copy of my letter of November 23, 2005 for your reference.  I have also enclosed copies of a letter recently received from Dr. Peter Spencer and Dr. Fred Berman of the Toxicology Information Center at the Center for Research for Occupational and Environmental Toxicology at Oregon Health & Science University in Portland.  In this letter, Drs. Spencer and Berman identify some specific chemical compounds which they believe may be responsible for Mrs. Wellard's continuing illness.

   In my letter of November 23, 2005, I requested that you have the file tested immediately for the presence of certain compounds, such as phenol compounds, particularly hydroquinone, as

March 6, 2006
Page 2

---

requested by Dr. Brandon West. I have not had any response from you to that letter, and at this time I do not know whether that testing has been performed, or whether it is now proceeding. The enclosed letter from Drs. Spencer and Berman suggests that the cause may be selenium, often used in photo processing, or pesticides such as methyl bromide, phosgene gas, or sulfuryl fluorine. We demand on behalf of Mrs. Wellard that the file be tested for these compounds, and any others that may be indicated by the enclosed letter from Dr. Berman and Dr. Spencer.

As you may not be aware, Mrs. Wellard is now partially disabled, as a result of her exposure to this file, and her condition continues to worsen. Any additional delay by the FBI in helping Mrs. Wellard find the cause of her problem will only have the effect of delaying her treatment. Therefore, we must insist that the file be tested as requested fully within thirty (30) days of the date of this letter, or we will be forced to seek an order from the appropriate federal court requiring the bureau to produce the file for testing.

In the alternative, arrangements could be made to have the testing performed at Columbia Analytical Labs in Oregon, as suggested by Dr. Berman in the attached letter.

In her letter of September 22, 2005, acting assistant director Mary B. Hannagan informed Mrs. Wellard that "any additional testing deemed medically relevant by your treating physicians will be performed at FBI expense." We insist that this promise by Mary Hannagan be acted upon immediately. If I do not have a response from you within two (2) weeks indicating that the testing is being performed, I will have no choice but to begin proceedings to obtain a court order requiring that the file be produced.

Thank you for your attention to this matter, and please feel free to call me at any time if you need any additional information.

Very truly yours,

DAVID E. ALEXANDER

DEA:eg
Enclosure
c:    Rose Wellard
       Mary B. Hannagan
       Robert Mueller
       Edward J. Tucker
       Butch Otter
       Mike Crapo
       Larry Craig

# EXHIBIT H

**FILE COPY**

LAW OFFICES OF

## RACINE OLSON NYE BUDGE & BAILEY
### CHARTERED

LOUIS F. RACINE (1917-2005)
WILLIAM D. OLSON
W. MARCUS W. NYE
RANDALL C. BUDGE
JOHN A. BAILEY, JR.
JOHN R. GOODELL*
JOHN B. INGELSTROM
DANIEL C. GREEN**
BRENT O. ROCHE
KIRK B. HADLEY
FRED J. LEWIS
MITCHELL W. BROWN
ERIC L. OLSEN
CONRAD J. AIKEN
RICHARD A. HEARN, M.D.†
DAVID E. ALEXANDER††
LANE V. ERICKSON**
LISA M. CHRISTON†††
PATRICK N. GEORGE
SCOTT J. SMITH
LISA A. WOOD, CPA
STEPHEN J. MUHONEN
BRENT L. WHITING
LISA R. TANNER‡
JUSTIN R. ELLIS
JOSHUA D. JOHNSON†††
JONATHON S. BYINGTON

201 EAST CENTER STREET
POST OFFICE BOX 1391
POCATELLO, IDAHO 83204-1391

TELEPHONE (208) 232-6101
FACSIMILE (208) 232-6109

www.racinelaw.net

SENDER'S E-MAIL ADDRESS: dea@racinelaw.net

**BOISE OFFICE**

101 SOUTH CAPITOL
BOULEVARD, SUITE 208
BOISE, IDAHO 83702
TELEPHONE: (208) 395-0011
FACSIMILE: (208) 433-0167

**IDAHO FALLS OFFICE**

477 SHOUP AVENUE
SUITE 203A
IDAHO FALLS, ID 83402
TELEPHONE: (208) 528-6101
FACSIMILE: (208) 528-6109

*ALSO MEMBER WY & IL BARS
**ALSO MEMBER UT BAR
†ALSO MEMBER D. C. BAR
††ALSO MEMBER MO BAR
†††ALSO MEMBER IL BAR
‡ALSO MEMBER CA BAR

May 17, 2006

Harold Hendershot
Deputy Assistant Director,
Records Management Division,
Federal Bureau of Investigation, Room 11703
J. Edgar Hoover Building
935 Pennsylvania Avenue, NW
Washington DC 20535

     RE:    Case ID#: 67E-HQ-897459SUBM
             Rose Wellard, Archive Technician
             Evaluation of Occupational Exposure

Dear Mr. Hendershot:

     As you are aware, this office represents Rose Wellard in matters relating to the illnesses she has suffered following her exposure to an old FBI file while at work almost two years ago. I understand that you spoke with Mrs. Wellard on Monday, May 8, 2005, at FBI offices in Pocatello, Idaho. It is my understanding that Mrs. Wellard asked questions about additional testing on the file, and you informed her that the FBI's occupational safety and health unit has possession of the file and is awaiting further instructions on what testing is required. She then gave you copies of letters we have written to the FBI with specific requests for tests to be performed. This list of potentially causative substances was prepared for us by neurotoxicologists at Oregon State University. This information was provided last November to persons at the FBI who had previously indicated to us that they would be responsible for seeing that these tests were performed. I am including with this letter copies of letters previously provided to the FBI.

May 17, 2006
Page 2

_____

It is also my understanding that you confirmed to Mrs. Wellard that there was a termite infestation at the FBI document warehouses where the file in question was stored in the summer of 2004, and that chemicals were sprayed in the warehouse to treat the infestation. The neurotoxicologists that we have consulted with have informed us that such chemicals may cause or contribute to illnesses similar to those experienced by Mrs. Wellard. Mrs. Wellard said that you promised you would let her know what chemicals were sprayed to treat the termite infestation. It will be sufficient if you forward that information to my attention.

We are asking once again that the necessary tests be performed, and the complete results provided to Mrs. Wellard. It is crucial for the treatment of Mrs. Wellard's unexplained illnesses that any toxic substances that may have existed in that file be identified as soon as possible. If the FBI is unwilling to perform the necessary tests itself, we must insist that it make the file available so that it can be given to qualified laboratories so that the testing can be performed.

I would appreciate it if you or a member of your staff could contact me within the next few days so that we can be assured that this matter is being handled appropriately. I can be reached at the number above.

Mrs. Wellard greatly appreciates your interest in this, and remains hopeful that with your assistance she can obtain the information that may permit her illnesses to be treated.

Please call me if there is any other information I can provide that would help you attend to this matter. Thank you for your assistance.

Very truly yours,

DAVID E. ALEXANDER

DEA:eg

cc      Rose Wellard

# EXHIBIT I



**U.S. Department of Justice**

Federal Bureau of Investigation

RECEIVED
MAY 2 5 2006
By_____

Washington, D. C. 20535-0001

May 19, 2006

Mr. David E. Alexander, Esq.
Racine Olson Nye Budge & Bailey
Post Office Box 1381
Pocatello, ID 83204-1301

Dear Mr. Alexander:

    In response to your March 3, 2006, inquiry regarding
your client, Ms. Rose Wellard, the following information is
furnished.  As you are aware, Ms. Wellard is employed as an
Archives Technician in the Federal Bureau of Investigation's
(FBI) Pocatello Information Technology Center.  She was exposed
to a noxious odor emanating from archives documents in July 2004.

    We are working through the FBI's Occupational Safety
and Environmental Programs Unit to arrange for the file to be
tested by the U.S. Public Health Service.  To date, testing on
the file has not been completed.  The U.S. Public Health Service
is requesting more guidance from the consultants advising you and
your client regarding any suggested analytical methods that would
be recommended to test for the presence of the compounds
suggested.  The FBI will try to provide that guidance but would
appreciate any additional suggestions which may prove useful for
definitive analysis.

    By way of background, you should already by aware that
the U.S. Public Health Service previously tested the file at
multiple sections and the outside yellow envelope and detected no
fungal or bacterial growth, except for three colony forming units
per square inch from the outside of yellow manila folder 91-5212-
180.  The bacterial growth finding is consistent with natural
background contamination.  Chemical residues were not part of the
testing protocol, as upon consultation with the U.S. Public
Health Service at that time, it was their opinion that
information derived from the analytical method would not be
indicative of the volatile components described by Ms. Wellard,
but would be indicative of the chemical composition of the paper.

    Since initial testing did not substantiate significant
microbial or bacterial growth coupled with the fact that the file
in question is indistinguishable from other files, it is

Mr. David E. Alexander, Esq.


difficult to form a medically plausible hypothesis which would
explain the file as the cause for Ms. Wellard's continuing
medical problems.  Information obtained from additional testing
will be furnished as soon as it becomes available to this office.

Sincerely yours,

Donald E. Packham
Assistant Director
Administrative Services Division

2

# EXHIBIT J

LAW OFFICES OF

# RACINE OLSON NYE BUDGE & BAILEY
## CHARTERED

LOUIS F. RACINE (1917-2008)
WILLIAM D. OLSON
W. MARCUS W. NYE
RANDALL C. BUDGE
JOHN A. BAILEY, JR.
JOHN R. GOODELL*
JOHN B. INGELSTROM
DANIEL C. GREEN**
BRENT O. ROCHE
KIRK B. HADLEY
FRED J. LEWIS
MITCHELL W. BROWN
ERIC L. OLSEN
CONRAD J. AIKEN
RICHARD A. HEARN, M.D.†
DAVID E. ALEXANDER††
LANE V. ERICKSON**
LISA M. CHRISTON†††
PATRICK N. GEORGE
SCOTT J. SMITH
LISA A. WOOD, CPA
STEPHEN J. MUHONEN
BRENT L. WHITING
LISA R. TANNER‡
JUSTIN R. ELLIS
JOSHUA D. JOHNSON†††
JONATHON S. BYINGTON

201 EAST CENTER STREET
POST OFFICE BOX 1391
POCATELLO, IDAHO 83204-1391

TELEPHONE (208) 232-6101
FACSIMILE (208) 232-6109

www.racinelaw.net

SENDER'S E-MAIL ADDRESS: dea@racinelaw.net

**BOISE OFFICE**

101 SOUTH CAPITOL
BOULEVARD, SUITE 208
BOISE, IDAHO 83702
TELEPHONE: (208) 395-0011
FACSIMILE: (208) 433-0167

**IDAHO FALLS OFFICE**

477 SHOUP AVENUE
SUITE 203A
IDAHO FALLS, ID 83402
TELEPHONE: (208) 528-6101
FACSIMILE: (208) 528-6109

*ALSO MEMBER WY & IL BARS
**ALSO MEMBER UT BAR
†ALSO MEMBER D. C. BAR
††ALSO MEMBER MO BAR
†††ALSO MEMBER IL BAR
‡ALSO MEMBER CA BAR

May 26, 2006

Donald E. Packham
Assistant Director
Administrative Services Division
Federal Bureau of Investigation
Washington, DC 20535-0001

RE:     Case ID#: 67E-HQ-897459SUBM
        Rose Wellard, Archive Technician
        Evaluation of Occupational Exposure
        Reference Letter of September 22, 2005 from Mary B. Hannagan to Rose Wellard

Dear Mr. Packham:

Thank you for your letter of May 19, 2006. Mrs. Wellard and I were very upset to learn that the testing we requested has not yet been done. We provided your office with certain specific requests for testing in November, 2005, and additional requests with my letter of March 3, 2006. Those tests could have been, and, I believe, should have been completed by now. We have no information we can provide you concerning suggested analytical methods for testing for the compounds suggested by our experts. The letter from Dr. Spencer and Dr. Berman which was enclosed with my last letter makes it clear that such information is best obtained from the analytical laboratory itself. The letter from Dr. Spencer and Dr. Berman provided the name and telephone number of an analytical laboratory which they recommended. If the United States Public Health Service requires additional information on testing methods, the most efficient method of obtaining that information would be to contact the laboratory identified in that letter.

Under the circumstances, we feel we must at this time insist that the FBI make the subject file available for outside testing. After this much time, we can only conclude that you are unwilling

June 23, 2006
Page 2

or unable to perform the necessary tests, and that it would be fruitless to give you additional time to do so. In the interest of Mrs. Wellard's health, we must have the tests performed as soon as possible. Please contact Columbia Analytical Laboratories at (360)577 – 7222 and make arrangements to have the file tested for the compounds identified by Dr. Spencer, Dr. Berman, and Dr. West. Failure to do so by June 2 , 2006, will result in an action being filed in Federal court in Pocatello to compel the FBI to make the file available.

Please feel free to call me at any time to discuss this matter.

Very truly yours,

DAVID E. ALEXANDER

DEA:eg
Enclosure
c:    Rose Wellard
      Mary B. Hannagan
      Robert Mueller
      Edward J. Tucker
      Rep. Butch Otter
      Sen. Mike Crapo
      Sen. Larry Craig

# EXHIBIT K

File Number: 142032827
CA-1011-O-I

U.S. DEPARTMENT OF LABOR

EMPLOYMENT STANDARDS ADMINISTRATION
OFFICE OF WORKERS' COMP PROGRAMS
PO BOX 8300 DISTRICT 14 SEA
LONDON, KY 40742-8300
Phone:  (206) 398-8100

June 5, 2006

Date of Injury: 07/19/2004
Employee:  ROSE A. WELLARD

ROSE A WELLARD
1298 RIDGE ST
POCATELLO, ID 83201

Dear Ms. WELLARD:

This Office is in receipt of Form CA-1 which you filed to provide notice of a traumatic injury.  You have stated that you sustained an injury on 07/19/2004 which resulted from exposure of unknown origin.  Your claim was originally received in our Office as a simple, uncontroverted case which resulted in minimal or no time loss from work.  These cases are administratively handled to allow medical payments up to $1500.00.  However, the merits of the claim have not been formally considered.

Since your medical bills have now exceeded $1500.00, this Office must formally adjudicate your claim.

Evidence received in support of your claim includes the following: your CA-1 Notice of Traumatic Injury, your statements, medical diagnostic test results, medical chart notes, your agency statement and your witness statements.

The evidence received is insufficient to support your claim because additional factual and medical documentation is needed.

Evidence is not sufficient to establish that you actually experienced the incident or employment factor alleged to have caused injury.

A physician's opinion as to how your injury resulted in the condition diagnosed has not been provided.

In further consideration of your claim, you are asked to respond to the question(s) on the attached page(s), sign, date, and return the attachment to this Office.   Send one copy of your answers to this Office and one copy of all of your answers to your employing agency for concurrence.

Your case will be held open for 30 days to afford you an opportunity to submit the requested information.  If the information is not received within 30 days from the date of this letter, a decision will be made based upon the evidence in file.

File Number: 142032827
CA-1011-O-I

You stated you were exposed to an unknown substance while reviewing archive documents. You further stated that the documents were being sent to your agency headquarters for testing. We have not received the results of the testing. Provide the test results. If testing was not performed, please state why. It is critical to know what you were exposed to in order to further adjudicate your claim.

We have received medical reports from Drs. Buitrago, McGee and Armour. However, these reports do not indicate whether and explain why the condition diagnosed is believed to have been caused or aggravated by your claimed injury. In notes from 01/10/2005, Dr. Buitrago references the need for testing of the files in order to make a definitive diagnosis. Provide an opinion from your physician indicating why the condition diagnosed is believed to have been caused or aggravated by your claimed injury, provided they have the results of the file testing.

**This evidence is crucial in consideration of your claim. You may wish to discuss the contents of this item with your physician.**

**TO THE EMPLOYING AGENCY: If the employee was treated at an agency medical facility for this injury, the employing agency must provide the treatment notes directly to OWCP.**

I certify that each and every statement made in response to the above questions is true to the best of my knowledge. I further understand that any person who knowingly makes any false statement, misrepresentation, concealment of fact, or any other act of fraud to obtain compensation as provided by the FECA or who knowingly accepts compensation to which that person is not entitled is subject to felony criminal prosecution and may, under appropriate criminal provisions, be punished by a fine or imprisonment, or both.

Signature_____Date_____

File Number: 142032827
CA-1011-O-I

Sincerely,

*Annette Wright*
Claims Examiner

Enclosure

US DEPARTMENT OF JUSTICE
FEDERAL BUREAU OF INVSTGTN
FBI HEADQUARTERS POCATELLO
FBI PITC 3975 POLE LINE ROAD
POCATELLO, ID 83201