IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROSE WELLARD, | Civ. No. 06-0260-E-BLW |
| Plaintiff, | |
| v. | MEMORANDUM DECISION AND ORDER |
| UNITED STATES DEPARTMENT OF JUSTICE, FEDERAL BUREAU OF INVESTIGATION, et al., | |
| Defendants. | |

## INTRODUCTION

The Court has before it plaintiff Wellard's motion for a preliminary injunction. The Court heard oral argument on October 3, 2006, and took the motion under advisement. For the reasons expressed below, the Court will grant the motion in part, and order that the archival file be tested for certain specific compounds within twenty days.

**Memorandum Decision & Order – page 1**

## FACTUAL BACKGROUND

Plaintiff Wellard works as an archive technician at the Pocatello office of the FBI.  Part of her job involves examining old files to determine their historic significance.  On July 19, 2004, she opened a 40-year-old file and "noted a very noxious odor coming from the file unlike anything I have ever smelled before or since."  *See Exhibit C to Complaint.*  She immediately became ill and has continued to suffer from respiratory and neurological problems since that date.

Wellard described the incident to Kirk Weber, the Occupational Safety Officer for the Pocatello office in August of 2004.  *See Exhibit C to Complaint.*  Pursuant to 29 C.F.R. § 1960.28(c), Weber (or whoever else was "designated to receive the reports in the workplace") "shall . . . reduce[] to writing . . . the . . . oral notification . . . ."  The regulations require the FBI to conduct an inspection (1) within 24 hours for reports of "imminent danger conditions;" (2) within 3 working days for "potentially serious conditions;" and (3) within 20 working days for other than serious safety and health conditions."  *See 29 C.F.R. § 1960.28(d)(3).*

The record does not show that any inspection was carried out within those time limits.  Wellard claims that throughout the remainder of 2004 she talked with various FBI officials in an unsuccessful attempt to get the file tested for contaminants that might have caused her illness.

**Memorandum Decision & Order – page 2**

In December of 2004, Wellard's physician, Dr. Martha Buitrago, wrote a letter to the FBI requesting that it test the file for "bacteria, fungus, and mycobacteria, as well as for chemical residue in order to find any clues as to [Wellard's] medical condition at this time." *See Exhibit D.* The FBI responded by sending the file to its Occupational Safety and Environmental Program (OSEP) in January of 2005. The OSEP tests, set forth in a report dated February 16, 2005, found no chemical residues and no significant fungal or bacterial growth. *See Exhibit A to Complaint.* The OSEP Report concludes that "[n]o further medical testing of the archive file is indicated at this time unless it becomes necessary to clarify specific questions raised by Ms. Wellard's medical evaluation." *Id.* at p. 3.

Sometime during this time frame, Wellard had filed a Workers' Compensation claim that was denied on the ground that she could not prove that her illness was work related. The decision denying her claim stated that "it remains unclear if you were exposed to any agent that caused your current condition." *See Exhibit N to Wellard Affidavit*.

On August 11, 2005, Wellard wrote a letter to the FBI requesting that either the FBI conduct further testing or that it release the file to her so she could do her own testing. *See Exhibit C to Complaint*. Mary Hannagan, Acting Assistant Director in the Human Resources Office of the FBI, responded on September 22,

**Memorandum Decision & Order – page 3**

2005, refusing to turn over the file and stating that "[a]ny additional testing deemed medically relevant by your treating physicians will be performed at FBI expense."

In a letter dated February 24, 2006, Dr. Fred Berman, the Director of the Toxicology Information Center at the Oregon Health and Science University, stated that Wellard's symptoms are "consistent with chemical exposure." *See Exhibit F to Complaint.* His research indicated that selenium could have been present because it was used "to enhance contrast in underdeveloped [photographic] images." *Id*. The file apparently contained some photographs that might contain selenium. Dr. Berman concluded that "[t]he toxicological profile for selenium would be consistent with the symptomology you describe." *Id*.

He also noted that fumigants could have been used in the area since it was subject to a termite infestation during the period that Wellard originally opened the file. Those fumigants, he observed, could have included methyl bromide, phosgene gas, and/or sulfuryl fluoride. He concluded that these fumigants were "more likely to produce the symptoms you describe" than other pesticides. *Id*. at p. 33.[1]

In March and May of 2006, Wellard's counsel provided these opinions to the

---

[1] Dr. Brandon West also examined Wellard and requested testing of the file for "phenol compounds and particularly Hydroquinone." *See Exhibit E to Complaint.*

**Memorandum Decision & Order – page 4**

FBI and demanded that the FBI test the file for these compounds.  On May 19, 2006, Donald Packham, the Assistant Director of the FBI's Administrative Services Division, responded, stating that

> [w]e are working through the FBI's Occupational Safety and Environmental Programs Unit to arrange for the file to be tested by the U.S. Public Health Service.  To date, testing on the file has not been completed.  The U.S. Public Health Service is requesting more guidance from the consultants advising you and your client regarding any suggested analytical methods that would be recommended to test for the presence of the compounds suggested.  The FBI will try to provide that guidance but would appreciate any additional suggestions which may prove useful for definitive analysis.

On May 26, 2006, Wellard's counsel responded that "[w]e have no information we can provide you concerning suggested analytical methods for testing for the compounds suggested by our experts."  He expressed frustration with the FBI's delays and threatened a lawsuit unless the FBI provided Wellard with the file.  When the FBI failed to turn over the file, Wellard filed this suit on June 30, 2006.

Wellard has now filed a motion for preliminary injunction seeking possession of the file to do her own testing.  The FBI argues that the Freedom of Information Act (FOIA) – the law upon which Wellard sought relief in her complaint – does not provide any support for Wellard's motion.  Wellard agrees, but argues in her reply brief, and during oral argument, that the regulations quoted

**Memorandum Decision & Order – page 5**

above, in combination with the Administrative Procedures Act (APA), support an order requiring the FBI to turn over the file.

## ANALYSIS

### 1. Legal Standard for Injunctive Relief

A moving party is entitled to a preliminary injunction if it demonstrates that it is likely to succeed on the merits and may suffer irreparable injury, or that serious questions exist on the merits and the balance of hardships tips in its favor. *See Self-Realization Fellowship Church v. Ananda*, 59 F.3d 902, 913 (9th Cir. 1995). The two tests are not separate but represent a sliding scale in which the required probability of success on the merits decreases as the degree of harm increases. *Id.* "Under any formulation of the test, the plaintiff must demonstrate that there exists a significant threat of irreparable injury." *Oakland Tribune, Inc. v. Chronicle Publishing Co.,* 762 F.2d 1374, 1376 (9th Cir.1985).

### 2. Analysis

The balance of hardships clearly tips in Wellard's favor. She is suffering serious health problems while the FBI has offered no countervailing policy reason for avoiding testing. Moreover, the potential harm to Wellard's health could be irreparable. Thus, Wellard need only raise serious questions on the merits of her claim to be entitled to injunctive relief.

**Memorandum Decision & Order – page 6**

Wellard cites no authority requiring the FBI to turn over the file to her. Nevertheless, there is authority requiring the FBI to do further testing. The regulation quoted above – 29 C.F.R. § 1960.28(d)(3) – clearly requires the FBI to conduct an "inspection" within certain time limits after receiving Wellard's report of a potential health hazard in the workplace. The regulatory "inspection" in the context of this case would consist of a laboratory analysis of the archive file.

The FBI has conducted one such analysis, but it was limited to a search for fungus and bacteria.[2] While a single analysis may suffice in some cases, it cannot constitute full regulatory compliance here when the health hazard may extend to exposure to materials other than those tested. Indeed, two medical professionals retained by Wellard have identified five specific compounds that might be present in the file and that might have caused Wellard's symptoms. This is no request for a "shot-in-the-dark" – Wellard has compelling evidence supporting a second round of testing.

The FBI is concerned, however, that it will be subjected to endless rounds of testing. It is true that during oral argument, Wellard's counsel refused to limit his requests for further testing, arguing that this next round of testing could reveal

---

[2] While the test report indicated that no "chemical residue" was found, it is unclear what this means. There is no discussion in the report of testing for any specific chemicals, and the FBI states later that its laboratory lacked a protocol for testing for chemical residues.

**Memorandum Decision & Order – page 7**

unanticipated concerns that would warrant further testing. He is free to so argue, and the Court will act as gatekeeper, weighing the medical need for further testing against other factors to determine if the testing should go forward. This should alleviate the FBI's concerns.

The FBI's counsel also complains that Wellard failed to cite the governing regulations in her complaint and moving papers, mentioned them for the first time in her reply brief, and used them to seek possession of the file, not additional testing. While all of these claims are true, and in most cases might preclude relief, they do not have that effect in this case.

The FBI's arguments raise the specter of ambush. The Court cannot allow clever counsel to raise novel legal theories late in the game that take opposing counsel by surprise. That is not a concern here, because these regulations are nothing new. The FBI has understood its regulatory obligations from the beginning. These obligations compelled the FBI to refer the file for testing to its Occupational Safety and Environmental Program Unit, which is set up to handle reports under 29 C.F.R. § 1960.28. And the FBI's insistence that it pay for this testing is explained by the same regulations. Tellingly, the FBI's counsel did not request at oral argument additional time to submit further briefing.

Wellard has been seeking additional testing for months, as the discussion

**Memorandum Decision & Order – page 8**

above shows.  While her complaint and motion papers sought possession of the file, she pursued that remedy only because her pleas for further testing were being ignored.  It would be anomalous to protect the FBI from the very remedy Wellard has pursued for so long because the FBI's rejection forced Wellard to pursue additional avenues of relief.

It has "long been established law" that "a plaintiff is entitled to any relief appropriate to the facts alleged in the [complaint] and supported by the evidence, even where he has not prayed for such relief." *Electrical Construction v Maeda Pacific Corporation*, 764 F.2d 619, 622 (9th Cir. 1985) (citations omitted).  The Court will follow that authority here because Wellard put the FBI on notice long ago that she wanted immediate testing of the file.

The second round of testing is required by 29 C.F.R.§ 1960.28(d)(3).  The FBI has not followed the required deadlines of that regulation, giving the Court authority to "compel agency action unlawfully withheld or unreasonably delayed" under § 706 of the APA.

For all these reasons, the Court finds Wellard has raised serious questions concerning the merits of her claim.  Based on this finding, and the others made above, the Court will issue an injunction requiring that the FBI begin testing, within twenty days from the date of this decision, the archival file for the presence

**Memorandum Decision & Order – page 9**

of the following: (1) selenium; (2) methyl bromide, (3) phosgene gas, (4) sulfuryl fluoride, and (5) Hydroquinone.[3]

The Court urges the parties to work this out – consensus is preferable to a command. The parties could craft a resolution far superior to anything the Court could cobble together. Thus, the Court will stand aside if the parties can reach an agreement.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for preliminary injunction (docket no. 7) is GRANTED IN PART AND DENIED IN PART. It is granted to the extent it seeks to require the Government to begin testing, within twenty days from the date of this decision, the archival file for the presence of the following: (1) selenium; (2) methyl bromide, (3) phosgene gas, (4) sulfuryl fluoride, and (5) Hydroquinone. It is denied in all other respects. This injunction shall remain in effect until further order of this Court.

---

[3] The Court will not require a bond. *See Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999), *supplemented by* 236 F.3d 1115 (9th Cir. 2001). The circumstances of this case are similar to those of *Barahona*.

**Memorandum Decision & Order – page 10**



DATED:  **October 6, 2006**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**Memorandum Decision & Order – page 11**